Max Leshnick v. Commissioner.
Leshnick v. Commissioner
Docket No. 50879.
United States Tax Court
T.C. Memo 1958-1; 1958 Tax Ct. Memo LEXIS 234; 17 T.C.M. (CCH) 1; T.C.M. (RIA) 58001; January 8, 1958
*234 David Lemelman, Esq., for the petitioner. Roger L. Davis, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined a deficiency in income tax against petitioner Max Leshnick for the year 1947 in the amount of $10,091.16. The only issue presented is whether respondent erred in determining that certain loans made by petitioner to a corporation constituted nonbusiness bad debts. Findings of Fact Such facts as are stipulated are found. Petitioner is a resident of Miami, Florida. He filed his Form 1040 income tax return for the year 1947 with the collector for the third district of New York. In 1932, when petitioner was about 25 years of age, he and Irving Podolnik learned that a 10-year lease was obtainable on a hotel property situated in Swan Lake, New York, and known as the President Hotel. The hotel was a summer resort hotel and had 155 guest rooms and a dining room which would seat about 375 persons. Petitioner and Podolnik obtained a 10-year lease on the property and at or about that time they each advanced $2,500 as their contributions to the capital of a partnership composed of themselves which *235 they formed to operate the hotel. Before opening the hotel for the season they found that additional money would be required for operations. They then interested Abraham Ellner in the business and he became a member of the partnership. However, the amount he contributed to the capital of the partnership is not disclosed. In order to make certain alterations of the hotel property prior to opening, the petitioner advanced $3,500 to the partnership as a loan. The amount was subsequently repaid to him. After operating the hotel as a partnership for a year or two, the parties organized a corporation which operated it thereafter. In its operation, entertainment was furnished dining room patrons. Operation of the business proved profitable. Podolnik and Ellner continued to own their interest in the corporation until about 1944. The petitioner continued to own his interest in it until sometime in 1947 when he "took over the Glenn Hotel in High Mount, New York," which "was a summer place." The petitioner served as general manager of the President Hotel and of the other hotels referred to hereinafter, the actual management of all of them being carried out by assistant managers under petitioner's *236 general supervision. About 1932 the petitioner ascertained that a lease was obtainable on a property known as Belfour Hotel in Lakewood, New Jersey. This hotel had less than 50 rooms and was operated as a weekend resort. A lease was taken on the property and it was operated by a partnership, composed of petitioner, Sam Mishkin and Nathan Gordon, which was formed for that purpose. The petitioner contributed $2,500 to the capital of the partnership. Mishkin and Gordon also made contributions to partnership capital of undisclosed amounts. The petitioner terminated his connection with the enterprise at the end of the second year of operations. About 1934, the petitioner found that a 5-year lease could be obtained on a 60-room hotel property known as the Madison Hotel in Lakewood, New Jersey. A partnership composed of petitioner, Sam Cooperman and one Esack was formed and took a lease on and operated the property for about 3 years when the lease was sold and the partnership was terminated. The initial capital of the partnership was $10,000 of which the petitioner contributed one-third. At the time the partnership took over the hotel it was in need of some refurbishing and the petitioner *237 advanced $5,000 to the partnership as a loan for that purpose. Subsequently the amount was repaid to petitioner. In 1937 and after the termination of the partnership which operated the Madison Hotel, the petitioner was introduced to one Blumenkranz who was operating the Blumenkranz Hotel in Lakewood, New Jersey. This hotel contained more than 50 rooms. Blumenkranz's operation of the hotel was not profitable and he desired to have the petitioner associated with him in its operation and to serve as manager. The petitioner was agreeable. He invested $6,500 or $7,500 in the enterprise and they operated the hotel as a partnership until 1939. The Balfour, the Madison and the Blumenkranz Hotels each had restaurants in them which were operated as a part of those enterprises. In 1939, after severing his connection with the Blumenkranz Hotel, the petitioner went to Miami, Florida, to look for a hotel which he could operate during the winter months. In Miami he found a vacant lot, and negotiated for and acquired in his individual capacity a 99-year lease thereon. He thereafter entered into a partnership with Bernie Coleman and Irving Miller which was formed for the purpose of constructing *238 a hotel building on the lot and operating it as such. Following its formation in 1940 the partnership constructed on the lot a 72-room hotel building with a coffee shop and bar. The building was known as the Cardozo Hotel. Partnership funds were insufficient to complete the construction of the building and the petitioner advanced $12,500 as a loan to complete its construction. The loan was evidenced by notes from Coleman and Miller. Petitioner, however, looked to the profitable operation of Cardozo for the repayment of the loan. The amount loaned was repaid to the petitioner. Coleman and Miller "did not get along." In 1941 Coleman "broke away" from the partnership and petitioner and Miller disposed of their interests in Cardozo. After Coleman withdrew from the Cardozo partnership, the petitioner and Irving Miller negotiated for and acquired a lease upon a likely site for the construction of a hotel in Miami Beach, Florida. The petitioner, Miller and Sam Kulok entered into a partnership which was formed for the purpose of constructing a hotel building on the lot and operating it as a hotel. Each made an initial contribution to partnership capital of $35,000. Further funds necessary *239 to construct the hotel, afterwards known as Haddon Hall, were obtained by a mortgage on the building. After completion of the building, it was necessary for the petitioner to advance to Miller and Kulok, as members of Haddon Hall partnership, $13,000 or $14,000, as a loan in order to properly furnish the building before opening for operation. "After the season" the loan was repaid to petitioner. Petitioner thereafter, in partnership with John Shapiro and Max Kinsbrunner, purchased a 4-year lease on the Whitehart Hotel in Miami Beach. Petitioner invested $3,500 for the lease and loaned $6,500 to Kinsbrunner to enable him to acquire an interest in the partnership. The petitioner made no further advances of money in connection with Whitehart. The lease was sold and the partnership discontinued its operation of the hotel about 1946. Kinsbrunner, under the supervision of the petitioner, managed the hotel during the period the partnership operated it. After the sale of the lease on the Whitehart Hotel, the petitioner, in partnership with Shapiro and Kinsbrunner, obtained a lease on the Coral Reef Hotel in Miami Beach and thereafter operated it. In 1945, while petitioner was still interested *240 financially in and was still managing the President, Haddon Hall, Whitehart and Coral Reef Hotels, he and Irving Miller obtained a lease upon land and a building in Miami Beach theretofore operated as a mess hall for military personnel. The petitioner made an investment of his own funds in an undisclosed amount to acquire the lease in the joint names of himself and Miller. It was their intention to operate the premises as a supper club or restaurant with a band for entertainment of customers. In order to rebuild and properly equip the building for that purpose it became necessary to obtain additional capital. To that end one Levi, "a sort of supper club operator," became associated in the venture with petitioner and Miller and they proceeded to rebuild and equip the premises. The venture was conducted as a partnership until some undisclosed date prior to October 1945, when a corporation known as Mocamba, Inc., was organized and took over and conducted the business until its dissolution in January 1946. Thereafter until July 1946 the venture was conducted as a partnership. In July 1946 Mocamba Restaurant, Inc., was organized and took over and conducted the business theretofore conducted *241 by the partnership. Mocamba Restaurant, Inc., continued in business until March or April 1947 when due to unprofitable operations it ceased business. However, it has never been formally dissolved. For convenience, the venture, whether conducted as a partnership or as a corporation, is hereinafter referred to as Mocamba unless otherwise designated. The petitioner's original investment in Mocamba was $7,500. Business was bad during the first season and before the season was over Levi sold his interest in the venture to Jack Friedlander and terminated his connection with the venture. About the time Levi disposed of his interest the petitioner made a loan to Mocamba in an undisclosed amount. Following several months of operation, business again began to go bad. About that time Michael Rosenberg became interested in the venture and Mocamba ceased to be operated as a supper club and thereafter was operated as a restaurant only. Also about that time petitioner made an additional loan to Mocamba in an undisclosed amount. Subsequently, Rosenberg "fell out" of Mocamba and Jerry Brooks acquired an interest therein. About that time the venture was taken over and conducted by Mocamba Restaurant, *242 Inc. During its operation, Mocamba was managed by petitioner, and while he had an interest therein, Friedlander. Mocamba was the first supper club or restaurant business distinct from such a business as part of a hotel operation in which petitioner had been interested in a business way. On several occasions during the period from July 1946 when Mocamba Restaurant, Inc., was organized until it ceased business in March or April 1947, the petitioner made loans to enable it to pay its current expenses. In making such loans, the petitioner made deposits in its bank account. Upon some occasions other parties interested in the corporation made loans equal to those made by petitioner. In other instances the petitioner's loans exceeded theirs, in which case the other interested parties delivered to petitioner "IOU's" in the form of letters for the excess amounts. With respect to the excess amounts loaned, the petitioner expected to be repaid from the profits of the corporation. In his income tax return for 1946, the petitioner reported income of $3,000 as having been received as salary from "President on Swan Lake, Inc." As his only other income the petitioner reported as distributive *243 shares of partnership income or loss the following amounts: President Hotel Operating Co. - Swan
Lake
$ 8,321.68
Whitehart Hotel - Miami Beach
5,770.09
Haddon Hall Hotel - Miami Beach
15,340.98
Mocamba Restaurant - Miami Beach
(Loss)
18,521.68
In his income tax return for 1947 the petitioner reported as income the amount of $925.24 received as an annuity or pension, and $4,792.23 as his share of net capital gains from partnerships. As his only other income the petitioner reported as his distributive share of partnership income or loss, the following amounts: President Hotel Operating Co. - Swan
Lake
$ 1,586.41
Whitehart Hotel - Miami Beach (Loss)
23.47
Haddon Hall Hotel - Miami Beach
20,264.04
Coral Reef Hotel - Miami Beach
15,899.03
Mocamba Club - Miami Beach (Loss)
2,342.64
In his income tax return for 1947 the petitioner deducted as a miscellaneous deduction the amount of $18,458.62 which was explained as follows: "Bad Debts - Advances to Mocamba Restaurant, Inc. - uncollectible." In determining the deficiency here involved the respondent determined that the petitioner was not in the business of loaning money and that the amount *244 deducted was not allowable as a business bad debt. He further determined that the amount represented a nonbusiness bad debt and allowed it as such. Opinion In his petition the petitioner assigns the following errors: "(a) The Commissioner erroneously determined that the bad debt in the sum of $18,458.62 due from Mocamba Restaurant Inc. was improperly deducted as a business bad debt on the petitioner's 1947 tax return on the ground that the petitioner is not in the business of lending money. "(b) That the amount disallowed is a nonbusiness bad debt." In his answer the respondent generally and in particular denied the petitioner's assignments of error. Neither party has filed any amendment to his pleading. The parties suggest on brief that the proceeding involves an issue as to whether the $18,458.62 represented a contribution by petitioner to the capital of Mocamba Restaurant, Inc., and the respondent also suggests that an issue as to the existence of an indebtedness of $18,458.62 and the worthlessness thereof is involved. As we view the pleadings neither of the foregoing issues is presented. Accordingly we regard the issue presented as being the narrow question of whether *245 the respondent erred in determining that the $18,458.62 was deductible as a nonbusiness bad debt instead of a business bad debt as deducted by petitioner in his return. The petitioner makes no contention that at any time during the period 1932 through 1947 he was engaged in the business of loaning money and on brief concedes that the record does not show that he was engaged in that business during that period. However, the petitioner takes the position that during that period his sole business "was that of investing his money in the purchasing and leasing of hotels and restaurants, for the purpose of managing and operating the same as a business of dealing in enterprises" and contends that the $18,458.62 in controversy represented an indebtedness arising in his conduct of such business, that it was a business indebtedness proximately related to the business carried on by him in 1947 and therefore was deductible by him as a business bad debt. The respondent contends that during 1947 the petitioner was not engaged in any trade or business to which the indebtedness proximately related. Beginning in 1932 and continuing for one or two years, the petitioner was a member of a partnership *246 which operated the President Hotel under lease. After having operated that hotel as a partnership for a year or two the petitioner and the other partners organized a corporation which thereafter operated the hotel. The petitioner disposed of his interest in that corporation in 1947. At some undisclosed time in 1947 the petitioner "took over the Glenn Hotel in High Mount, New York," which "was a summer place." Aside from the foregoing, the record is silent as to the Glenn Hotel and the petitioner's relationship to it. In his income tax return for 1946 the petitioner reported as income a salary from "President on Swan Lake, Inc., Swan Lake, N. Y." We are not otherwise informed as to this corporation or its activities or operations and it may well be that it was the corporation that was formed by petitioner and his partners and which operated the President Hotel following its operation by the partnership. In his income tax returns for 1946 and 1947 the petitioner reported certain sums as his distributive shares of partnership income from "President Hotel Operating Co., Swan Lake, N. Y." The record is also silent as to when this partnership was formed and as to what activities or operations *247 it conducted. In view of the foregoing state of the record we can only conclude that the petitioner's relationship to the President Hotel from about 1933 to 1947 was that of a stockholder in and officer or employee of the corporation which operated the hotel during that period. From about 1932 until about 1934 the petitioner was a member of a partnership which operated the Balfour Hotel under lease. From about 1934 until about 1937 the petitioner was a member of a partnership which operated the Madison Hotel under a lease. The latter operation was terminated upon the sale of the lease about 1937. From that time until 1939 the petitioner was a member of a partnership which operated the Blumenkranz Hotel. The record is silent as to whether the hotel was operated under lease or whether it was owned by the other partner, Blumenkranz. From 1939 until 1941 the petitioner was a member of a partnership which constructed and operated the Cardozo Hotel. The petitioner's connection with this hotel and its operation was terminated by the petitioner's disposition of his interest in the property and the termination of the partnership in 1941. In 1941 the petitioner entered into a partnership *248 which constructed and operated the Haddon Hall Hotel. The partnership continued to operate the hotel during 1947. Beginning at an undisclosed prior time and continuing until 1945 or 1946, the petitioner was a member of a partnership which operated the Whitehart Hotel under a 4-year lease. The partnership and its operation of the hotel were terminated upon the sale of the lease about 1945 or 1946. The petitioner was also a member of a partnership which operated the Coral Reef Hotel under lease. The partnership continued to operate the hotel during 1947. The petitioner served as general manager of the foregoing hotels during the time they were operated by the partnerships of which he was a member. The foregoing comprises all of the business connections and activities of the petitioner during the period 1932 through 1947, except for the Mocamba venture. That venture originally was a partnership, then it was operated by Mocamba, Inc., then again conducted as a partnership from January 1946 to July 1946 and then operated by Mocamba Restaurant, Inc., from July 1946 until March or April 1947. The President Hotel operated a dining room and the Balfour, Madison and Blumenkranz Hotels each *249 operated a restaurant. The Cardozo Hotel in Miami, with which petitioner's connection terminated in 1941, operated a coffee shop and bar. None of the other hotels in Florida which were operated by partnerships of which the petitioner was a member are shown to have operated a dining room or a restaurant, or a coffee shop. The petitioner claims that , reversing a Memorandum Opinion of this Court, decided October 29, 1954 [; , supports his contention that he was in the business of dealing in enterprises. In that case the taxpayer on 11 or 12 occasions during 1925 through 1945 had engaged in various business ventures. In determining that in 1945 the taxpayer was engaged in the business of "dealing in enterprises" the Court of Appeals described the taxpayer's business as follows: "he was regularly engaged in the business of seeking out business opportunities, promoting, organizing and financing them, contributing to them substantially 50% of his time and energy and then disposing of them either at a profit or loss * * *" In the Giblin case the taxpayer was regularly attempting *250 to acquire and promote business enterprises with the intent of future disposal. In the instant case there is nothing to indicate that the petitioner promoted any enterprise for the purpose of future disposal. Instead, his aim was to promote enterprises for the purpose of operating them through the instrumentality of partnerships and obtain a share of the profits derived from the operations. The petitioner's activities over the period from 1932 through 1947 were those of one who was operating enterprises rather than those of one who was dealing in them as a business. As a further ground to support his contention that he was entitled to deduct the amount in controversy as a business bad debt, the petitioner urges that the business conducted by Mocamba Restaurant, Inc., was so closely connected with the business conducted by him, that it was a separate business of his and was not in a strict sense the business of the corporation. Although the record does not clearly indicate the petitioner's relationship to Mocamba Restaurant, Inc., the petitioner states on brief that he was "an officer, director and stockholder and principal actor" in that corporation. In , *251 the Supreme Court made it plain that the business of a corporation is not the business of its stockholders and officers. Consequently, the petitioner cannot appropriate to himself as his own business the business conducted by Mocamba Restaurant, Inc. As was said in , to escape classification as a nonbusiness bad debt, a debt and the loss from its worthlessness must bear a proximate relation to a business in which the taxpayer is engaged at the time the debt becomes worthless. From the record presented, we are unable to find a proximate relationship of the indebtedness of Mocamba Restaurant, Inc., to the petitioner to any business in which the petitioner was engaged in 1947 when the indebtedness became worthless. The respondent's determination that such indebtedness constituted a nonbusiness bad debt is sustained. Decision will be entered for the respondent.